IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF IOWA

| | |
|---|---|
| IN RE: ) | |
| ) | Chapter 7 |
| JASON A. LAMPE, ) | |
| CHRISTA R. LAMPE, ) | |
| ) | Bankruptcy No. 16-00590 |
| Debtors. ) | |
| ) | |
| VERIDIAN CREDIT UNION, ) | |
| ) | |
| Plaintiff, ) | Adversary No. 16-09034 |
| ) | |
| v. ) | |
| ) | |
| JASON A. LAMPE, ) | |
| ) | |
| Defendant. ) | |

### TRIAL RULING

This matter came on for trial in Cedar Rapids, Iowa on August 1, 2017. Debtor Jason Lampe ("Debtor") appeared pro se. Kenneth Nelson appeared for Veridian Credit Union ("Veridian"). The Court heard testimony and received evidence. The parties filed post-trial briefs. The Court took the matter under advisement. This is a core proceeding under 28 U.S.C. § 157(b)(2).

### STATEMENT OF THE CASE

Veridian had a security interest in Debtor's truck. Debtor defaulted on the debt and Veridian sought to repossess the truck. Debtor eventually surrendered the truck to Veridian. When Veridian's representatives picked up the truck, it had

been damaged. Veridian argues that Debtor's entire debt to Veridian is nondischargeable because Debtor willfully and maliciously damaged the truck before surrendering it. Debtor argues that he did not damage the truck. Debtor argues that the damage occurred after he surrendered the truck.

## FINDINGS OF FACT

On July 20, 2015, Veridian loaned Debtor $39,897.37 at 3.49% interest. That loan was for and secured by a 2014 Ford F-150 FX4 pickup truck valued at $42,875.00 ("the truck"). Under the loan, Debtor was to make monthly payments of $614.53. Debtor defaulted on the loan after only five months. The last payment that Debtor made was on December 31, 2015. The payoff amount on Debtor's loan with Veridian was $39,270.53 as of September 7, 2016.

Lori Youngblut works as a Credit Consultant in Veridian's collections department. As a part of her job, she works to repossess Veridian's security for delinquent loans. When a loan is 60 days or more delinquent, Ms. Youngblut contacts a repossession specialist to repossess the security.

Ms. Youngblut worked on repossessing Debtor's truck. On or around April 21, 2016, Ms. Youngblut hired a company called The Repo Man, LLC located in Waterloo, Iowa to repossess the truck. Despite substantial effort, The Repo Man was unable to locate the truck.

Cherie Pichone and Mike Voshell are partners at The Repo Man. Ms. Pichone testified about their efforts to repossess the truck. When Ms. Pichone was looking for the truck at Debtor's workplace in Waverly, she saw one of his parent's cars. Ms. Pichone concluded that Debtor had switched his truck with one of his parent's cars and was hiding his truck at his parents' house.

Based on this information and belief, on the morning of April 29, 2016, Ms. Pichone and Mr. Voshell went to Debtor's parents' house in Sumner, Iowa. Ms. Pichone talked to Debtor's parents, but did not find the truck.

Later that same day, Debtor's attorney called Ms. Youngblut and left a voicemail. He told Ms. Youngblut that Debtor had surrendered the truck. He said that Debtor left the truck in the parking lot of the Veridian branch on Ansborough Avenue and that the keys were in the center console. Ms. Youngblut received the message at 3:53 PM. She had been at work the entire day and regularly checks her voicemail.

Six minutes after listening to the voicemail, Ms. Youngblut emailed and then phoned Mr. Voshell, to let him know that Debtor had surrendered the truck at the Ansborough branch. Ms. Youngblut asked him to reply and let her know if The Repo Man would be able to pick up the truck before 5:00 PM—the closing time at the Ansborough Avenue Veridian branch. Ms. Youngblut, who works at a

different branch, wanted to know whether she needed to have a Veridian employee at the Ansborough Avenue branch retrieve the keys before the branch closed.

Ms. Pichone and Mr. Voshell were able to get to the truck immediately. They had both been in their tow truck looking for Debtor's truck when Ms. Youngblut contacted them. At 4:06, Ms. Pichone replied to Ms. Youngblut's email and said that they would be able to pick up the truck before 5:00 PM. Ms. Pichone and Mr. Voshell immediately went to the Ansborough Avenue Veridian branch. They arrived within 30 minutes.

Ms. Pichone testified that she immediately noticed significant damage and alteration to the truck. The truck had scratches on the paint (Ms. Pichone described these as "key marks"), the screen on the dashboard interface was smashed, the tailgate and running boards were gone, and the "F-150" emblems were gone (there are clearly visible holes where the emblems were attached). The truck also appeared to have different wheels than expected. There was no debris around the truck. Around 4:38 PM, Ms. Pichone started photographing the damage to the truck. Those photos were admitted into evidence.

The Veridian branch was still open when The Repo Man arrived. The branch was busy with many customers because it was a Friday afternoon at the end of the month. The Ansborough Avenue branch is the main Veridian office in Waterloo. The branch is located on the corner of Ansborough Avenue and

Highway 63. There are two entrances to the Ansborough Avenue Veridian branch: one on the north side, and one on the south side. Ms. Pichone located the truck parked among a number of other vehicles near the south entrance. There are windows facing the parking lot on that side of the building—an employee could see if someone damaged the truck after Debtor dropped it off. The truck was unlocked and the keys were in the center console.

 Ms. Pichone emailed a Veridian representative about the condition of the truck when she arrived. She sent the photos to Veridian. A few days later, after additional emails, Ms. Pichone sent pictures of what the truck exterior actually looked like before the damage occurred. Ms. Pichone had gotten these pictures from Debtor's Facebook page. These pictures were also submitted into evidence. They show the truck before it was damaged: it did not have scratches, it had different wheels and tires, the emblems were in place, and both the running boards and the tailgate were in place.

 The Repo Man held the truck for the 10-day redemption period. After 10 days, The Repo Man sent the truck to Des Moines Auto Auctions. Once in Des Moines, SEM Enterprises, LLC conducted an estimate of repairs for the truck. A new dashboard interface was going to cost $1,266.70. Various parts of the truck needed to be replaced, repaired, or painted. The estimate for that work was

$1,522.36.  The estimate also noted that replacing the tailgate and accompanying parts would cost $2,575.09.

Veridian received estimates on these repairs on September 8, 2016.  No evidence has been offered that the truck was damaged between April 29, 2016 (time of repossession) and September 8, 2016 (the date of the estimate).  The repairs have not been made and the truck has not been sold—pending the outcome of this litigation.

Veridian offered a NADA value for the truck into evidence.  The NADA value sets out the estimated auction, trade-in, and retail values for the truck depending on condition.  Based on the NADA value for the truck, Veridian would have expected to get between $20,422 and $27,397 for the truck at auction, depending on condition, had the damage not occurred.

Debtor offered a different version of the facts.  Debtor works for RADA Manufacturing in Waverly, Iowa.  He has worked there for 20 years.  In April 2016, Debtor was working the first shift at RADA.  The first shift is from 7:00 AM to 3:30 PM. Debtor testified that, on April 29, 2016, when he dropped the truck off, he took a half-day of vacation because he had other errands to run that afternoon. Debtor had been driving his parents' Ford Focus to save on gas.  Debtor left work at 11:00 AM, drove to Clarksville to get the truck, and then drove to the

Veridian location in Waterloo to drop the truck off. He claims he dropped the truck off around noon and called his attorney around 1:30 PM.

Debtor testified that he did not damage the truck. Debtor admitted he had changed the wheels and tires because he did not like how the stock tires looked. Debtor said that the damage shown in the photographs was not present when he dropped the truck off. Debtor does not know who damaged the truck. Debtor's position is that the damage happened—the truck was keyed, the emblems were removed, the dashboard screen was smashed, and the tailgate was removed—between noon (when he dropped it off) and 4:30 PM (when The Repo Man arrived) in the Veridian branch parking lot.

Debtor testified that he filed a claim with his insurance company for the damage to the truck. Debtor testified that the insurance company denied the claim because it found that the damage occurred after The Repo Man repossessed the truck.

The Court does not find Debtor's testimony to be credible. The Court finds that the damage occurred before Debtor dropped the truck off at Veridian. Even assuming that Debtor left work early that day, his suggestion that the damage—including removing a tailgate—occurred within a 4-hour period in broad daylight, at a busy intersection, in a busy parking lot, in view of Veridian employees, is simply unpersuasive.

Veridian also introduced evidence the Debtor had a pattern or practice of damaging Veridian collateral. Veridian showed that Debtor had also damaged his home while it was in foreclosure. This evidence shows a pattern of willful and malicious damage to Veridian's security.

Debbie Spilker works for Veridian as a loss-mitigation and foreclosure specialist. She testified about a home mortgage that Debtor and his wife had with Veridian. Debtor and his wife borrowed $104,800 to buy the home.

The mortgage went into default. Debtor contacted Ms. Spilker. He told her that he would not be making any more payments on the home. He said that he was no longer living in the home. He said that his wife was living in the home and that he had a no-contact order that prevented him from going there.

Debtor filed bankruptcy on May 12, 2016. In June, Veridian determined that the home was vacant and changed the locks. Veridian's real estate agent entered the home and took photographs of the damage. He sent those photographs to Veridian. They showed substantial damage to walls and fixtures in the home. Some fixtures were entirely torn out and no longer present. As a result, Veridian changed the locks on the home a second time.

Veridian foreclosed on the home. The Iowa District Court for Bremer County entered a judgment and decree of foreclosure for the home on July 27, 2016. The foreclosure was filed without redemption rights. Debtor Christa Lampe

filed for a 6-month delay of sale. The home went to sheriff's sale on November 15, 2016.

Debtor claims he did not damage the house. Debtor claims he was not at the house during that time and that he does not know who damaged the house.

The Court finds Debtor's testimony on the home damage to lack credibility as well. The Court finds that this evidence shows a pattern of conduct on Debtor's part during this time. This evidence indicates that Debtor intentionally damaged the truck, knowing it was Veridian's security, before he surrendered it to Veridian.

## CONCLUSIONS OF LAW AND ANALYSIS

The Bankruptcy Code provides:

> A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—
> . . . (6) for willful and malicious injury by the debtor to another entity or to the property of another entity;

11 U.S.C. § 523(a). A security interest in a vehicle "is a sufficient property interest to state a claim under § 523(a)(6)." Credit Union 1of Kan. v. Murrow (In re Murrow), Bankr. No. 07-41061, Adv. No. 07-7119, 2008 WL 819042, at *2 (Bankr. D. Kan. Mar. 24, 2008).

"In the Eighth Circuit, the terms 'willful' and 'malicious' are two distinct elements, each of which must be shown to establish an exception to discharge." Jeffries v. Sullivan (In re Sullivan), 337 B.R. 210, 212 (Bankr. W.D. Mo. 2005) (citing Fischer v. Scarborough (In re Scarborough), 171 F.3d 638, 640 (8th Cir.

9

1999)). "To prove wilfulness, the creditor must show by a preponderance of the evidence that debtor intended the injury, not just a deliberate or intentional act leading to injury." Greenwood v. Dickhaus (In re Dickhaus), 425 B.R. 827, 832 (Bankr. E.D. Mo. 2010) (citing Kawaauhau v. Geiger, 523 U.S. 57, 61–62 (1998) and Grogan v. Garner, 498 U.S. 279, 280, 111 (1991)). "To prove malice, the creditor must prove debtor's conduct was specifically targeted at the creditor." Id. at 833 (citing Hobson Mould Works, Inc. v. Madsen (In re Madsen), 195 F.3d 988, 989 (8th Cir. 1999)). "Therefore, in order for a debt to be non-dischargeable pursuant to § 523(a)(6), the debtor must have intended the injury to the creditor (willful) and intended the harm to the creditor (malicious)." In re Sullivan, 337 B.R. at 213 (citing Osborne v. Stage (In re Stage), 321 B.R. 486, 492–93 (B.A.P. 8th Cir. 2005)). "This Court may consider both direct evidence of Debtor's subjective state of mind and evidence of the surrounding objective circumstances, and then may make appropriate inferences as to whether Debtor harbored the proscribed intent." Bank of Iberia v. Jeffries (In re Jeffries), 378 B.R. 248, 256 (Bankr. W.D. Mo. 2007) (citing Barclays Am./Bus. Credit, Inc. v. Long (In re Long), 774 F.2d 875, 881 (8th Cir. 1985)).

The Court finds that the Bank has shown by a preponderance of the evidence that Debtor willfully and maliciously damaged the truck. All of the circumstantial evidence indicates that Debtor damaged the truck, despite his testimony otherwise.

10

His testimony that he had no idea what happened to the truck—and that the damage was not present when he dropped it off—is unpersuasive. The damage to the truck itself, specifically the key marks, removed emblems, and smashed screen, shows that Debtors' actions in damaging the truck were willful. Debtor stated that he felt Veridian had treated him unfairly and that he did not trust Veridian's representatives. He was frustrated that, despite previously making all his payments on time for many years, Veridian gave him no credit for doing so. This testimony, along with the damage to Debtor's home, indicates that Debtor acted maliciously towards Veridian in damaging the truck. Debtor knew that Veridian had a security interest in the truck. He also knew that Veridian was seeking to repossess the truck. He was very frustrated by Veridian. All of the credible evidence in this case indicates that Debtor willfully and maliciously caused damage to the truck.

Thus, some amount of Debtor's debt to Veridian is nondischargeable. The remaining issue is the amount that is nondischargeable. Veridian argues that the entire debt—$39,270.53 on the date of filing—is nondischargeable, plus the $5,364.15 in repair costs. The Court disagrees.

"While Plaintiff has asked that this Court find the entire debt nondischargeable, the debt may be declared **nondischargeable only to the extent of the damage caused by Debtor**'s wilful and malicious conduct." In re Jeffries 378 B.R. at 256 (emphasis added); see also Franklin Bank v. Barnes (In re Barnes),

11

369 B.R. 298, 311 (Bankr. W.D. Tex. 2007) ("Where a plaintiff is harmed by the tortious, wrongful sale of encumbered property, the measure of the non-dischargeable injury under § 523(a)(6) is the fair market value of the property when it is sold. It has nothing to do with collection of a note or the debt."). Thus, "damages [are] measured by the extent to which [the lender] would have had value in the collateral to recover its debts, but for the **Debtor's wilful and malicious conduct causing a reduction** in its value." In re Jeffries 378 B.R. at 256. Plaintiff provides no authority otherwise.

Here, the unrefuted evidence shows that the cost to repair the truck would be $5,364.15. There was no evidence about the truck's diminution in value resulting from Debtor's damage—only about the cost to repair that damage. Accordingly, the Court finds that $5,364.15 of Veridian's claim is nondischargeable.

## CONCLUSION

**WHEREFORE**, judgment is hereby entered in favor of Plaintiff in the amount of $5,364.15.

Dated and Entered:  December 22, 2017

_____
THAD J. COLLINS
CHIEF BANKRUPTCY JUDGE